1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
2                    ALEXANDRIA DIVISION

3   UNITED STATES OF AMERICA,   )  Case 1:17-cr-00284
                                )
4                 Plaintiff,    )
                                )
5        v.                     )  Alexandria, Virginia
                                )  January 18, 2019
6   CHRISTOPHER ROBERT SUEIRO,  )  10:58 a.m.
                                )
7                 Defendant.    )
    _____)  Pages 1 - 76
8

9           TRANSCRIPT OF MOTIONS HEARING

10      BEFORE THE HONORABLE ANTHONY J. TRENGA

11        UNITED STATES DISTRICT COURT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25     COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

```
 1  APPEARANCES:

 2  FOR THE PLAINTIFF:

 3        JAMES E. BURKE, ESQUIRE
          KELLEN S. DWYER, ESQUIRE
 4        OFFICE OF THE UNITED STATES ATTORNEY
          2100 Jamieson Avenue
 5        Alexandria, Virginia  22314
          (703) 299-3700
 6
    FOR THE DEFENDANT:
 7
          EUGENE V. GOROKHOV, ESQUIRE
 8        BURNHAM & GOROKHOV, PLLC
          1424 K Street, N.W., Suite 500
 9        Washington, D.C.  20005
          (202) 386-6920
10
    THE DEFENDANT, CHRISTOPHER ROBERT SUEIRO, IN PERSON
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              THE CLERK:  Criminal Case 1:17-cr-284, *United*
2  *States v. Christopher Sueiro*.

3              Counsel, will you please note your
4  appearances for the record.

5              MR. BURKE:  Good morning, Your Honor.

6              THE COURT:  Good morning.

7              MR. BURKE:  Jim Burke and Kellen Dwyer on
8  behalf of the United States.

9              THE COURT:  Good morning.

10             MR. GOROKHOV:  Good morning, Your Honor.
11 Eugene Gorokhov here as court-appointed counsel for
12 Mr. Sueiro.

13             THE COURT:  All right.  Mr. Sueiro is
14 present.

15             We're here for a motions day.  Mr. Gorokhov,
16 do you want to summarize what outstanding matters there
17 are pending?

18             MR. GOROKHOV:  Yes, Your Honor.

19             There's the defendant's motion to represent
20 himself which remains outstanding.  I have not been
21 able to speak with Mr. Sueiro, which is his right.
22 I've made attempts to do so but have not been
23 successful.  There's the pending motion for a bill of
24 particulars, and finally, Your Honor, the suppression
25 motion.

1          THE COURT:  Okay.  We also have, filed by

2    Mr. Sueiro, what appears to be a motion to dismiss

3    based on the Speedy Trial Act.

4          THE DEFENDANT:  There is actually --

5          THE COURT:  Have a seat for a moment,

6    Mr. Sueiro.

7          THE DEFENDANT:  -- listed on there as well

8    for why this must be dismissed.  It is not just a

9    Speedy Trial Act.

10          THE COURT:  All right.  Have a seat for a

11    moment.

12          From the government's perspective, are there

13    any other outstanding issues?

14          MR. BURKE:  No, Your Honor.

15          THE COURT:  All right.  Mr. Sueiro, why don't

16    you come to the podium, please.

17          THE DEFENDANT:  That's exactly what I was

18    wanting to do.

19          THE COURT:  Mr. Sueiro, are you still

20    requesting to represent yourself?

21          THE DEFENDANT:  To be clear, I am not -- it's

22    not that I'm requesting.  It's that it is my right, and

23    so I am just simply doing it.  It -- I don't need to

24    request something that is my lawful right to do.

25          The *Faretta* law -- I did look over it -- it

1   actually says the same kind of thing:  That once

2   someone has been shown to be competent, as I have with

3   the competency evaluation, that they cannot be denied

4   their right to self-representation under the Sixth

5   Amendment.

6          And furthermore, it's a moot point anyway

7   because the case law of *Marbury v. Madison* states,

8   quote, The Constitution of these United States is the

9   supreme law of the land.  Any law that is repugnant to

10  the Constitution is null and void of law.

11         Now, one of the meanings of the word

12  "repugnant," if you look in the dictionary, is

13  contradictory.  So that law is contradictory to the

14  Constitution because the Constitution under the Sixth

15  Amendment says I have right to counsel, but it does not

16  say obligation to counsel.

17         There's a difference between a right and an

18  obligation.  The right is optional whereas an

19  obligation would be, of course, mandatory.  Since it is

20  a right, that means I have the right to exercise or to

21  waive it as I have stated already that I have done.

22         And because of the case law of *Marbury v.*

23  *Madison*, that negates the *Faretta* law and any other law

24  you could ever point to or create that contradicts the

25  Constitution as that law does.

1          So, therefore, I am not asking to represent
2  myself, and I'm not asking permission or motion for it
3  or anything because it's my right.  So I'm just simply
4  going to exercise my right, and that's that.
5          Now, I also have come with, now, an official
6  motion to dismiss, which I would've done earlier but
7  it's hard to get paperwork at the Alexandria facility.
8  It kept denying me.  That's why it's taken so long.  So
9  now I finally got that.
10         And just to enter it on the record, it does
11  say that I respectfully move this Court to take the
12  following action in this case.  It then says, quote,
13  dismiss the case for the following reasons:
14         One, my Sixth Amendment right to speedy trial
15  has unequivocally and egregiously been violated as the
16  date for its deadline was May 1, 2018;
17         Two, this Court lacks the jurisdiction as
18  required by law.  Therefore, no lawful discretion
19  exists but to dismiss the action for want of
20  jurisdiction;
21         Three, the law actually requires there to be
22  at least one actual individual victim in a case in
23  order for the case to be legitimately criminally
24  prosecuted, and the role of the victim cannot be
25  assumed by an organization or corporation such as the

1  corporation known as the United States of America.  But

2  rather, the victim must be an individual, and that

3  individual must be present in the court and take the

4  stand to testify a claim against the one charged as to

5  how they feel personally victimized by the alleged --

6          My apologies.  I'll start after United States

7  of America:

8          But rather the victim must be an individual,

9  and that individual must be present in the court and

10 take the stand to testify a claim against the one

11 charged as to how they feel personally victimized by

12 the alleged action -- S in parentheses -- that the

13 accused is charged with in some way that caused them to

14 incur some sort of damage to their personal property

15 and/or loss of their property.

16         There's no such victim in this case.

17         Also, if you look, *Black's Law Dictionary*

18 defines the meaning of victim.  So now, Mr. Trenga,

19 there's actually -- there's actually three reasons --

20         THE COURT:  I want you -- I want you to stop

21 for a moment.

22         THE DEFENDANT:  -- not one.

23         But I'm not done entering -- I've entered the

24 motion now into the record, but now I must also

25 remind --

```
 1              THE COURT:  Mr. Sueiro, I'm directing you to
 2   stop talking.
 3              THE DEFENDANT:  But I'm within my lawful
 4   rights to do what I'm doing as the case law Earle v.
 5   McVeigh states, which I've told you before:  Every
 6   person is entitled to an opportunity to be heard in a
 7   court of law upon every question involving his rights
 8   or interests before he's affected by any judicial
 9   decision on the question.
10              And Renaud v. Abbott says it is a fundamental
11   doctrine of law that a party to be affected by a
12   personal judgment must have his day in court and an
13   opportunity to be heard.
14              I'm doing nothing but exercising my lawful
15   rights.
16              So under the first reason here, as I said --
17              THE COURT:  Mr. Sueiro, I'm directing you to
18   be quiet for the last time, or you're going to be
19   removed from the courtroom.  Do you understand?
20              THE DEFENDANT:  That would be a useless
21   delaying tactic on your part, Mr. Trenga, because you
22   know by law I have to be present.
23              I'm just getting my motion onto the record
24   and making it clear why I'm citing these three reasons.
25              THE COURT:  Marshal, would you have
```

1  Mr. Sueiro sit down, please.

2        THE DEFENDANT:  I'm -- I'm just making it

3  clear as to why I'm citing these three reasons.

4        THE COURT:  All right.  Sit down, sir.  Sit

5  down.  Sit down.

6        THE DEFENDANT:  I'm exercising my lawful

7  rights.

8        THE COURT:  Sit down.

9        Mr. Sueiro, you have the right to represent

10 yourself if, among other things, you agree and

11 represent you agree that you're going to follow the

12 Court's directions.  That means you speak when you're

13 instructed to speak, you stop speaking when you're

14 instructed not to speak, and you comply with the rules

15 of court.  Are you prepared to comply with the rules of

16 court?

17       THE DEFENDANT:  According to the letter of

18 the law, that differs from what you're saying now.

19       THE COURT:  All right.  And also, if you

20 don't comply with the Court's rulings, you're going to

21 be removed from the courtroom, and the case will

22 proceed with your appointed counsel in your absence.

23 Do you understand that?

24       THE DEFENDANT:  That I do not -- I comprehend

25 what you're saying, but I do not -- I don't stand under

1  that.

2          THE COURT:  All right.

3          THE DEFENDANT:  That is not the letter of the

4  law.

5          THE COURT:  All right.

6          THE DEFENDANT:  The letter of law, as I just

7  quoted to you, says that I have the right to represent

8  myself because I have the right to waive my Sixth

9  Amendment right to --

10         THE COURT:  All right.

11         THE DEFENDANT:  -- to counsel, which I have

12  done.  You can't take that right away from me unless I

13  agree to give it up, which I am not doing, which I

14  would be doing if I agreed to do things your way, which

15  is not according to the law.  I am doing things

16  according to how the law -- the letter of the law

17  operates.  And that is why I make this motion to

18  dismiss.  Because the first of the reasons about the --

19  the Sixth Amendment right to speedy trial being

20  violated, as I said, the date for that deadline was

21  May 1.  We are now more than eight months past that

22  deadline.

23         Now, the case law of *Cooper v. Aaron* states

24  no state legislator or executive --

25         THE COURT:  All right.  That's enough.

1  That's enough, Mr. Sueiro.

2            THE DEFENDANT:  -- or judicial officer can

3  war against the Constitution --

4            THE COURT:  All right.

5            THE DEFENDANT:  -- without violating his

6  undertaking to support it.

7            And secondly, *Scheuer v. Rhodes* states --

8            THE COURT:  All right.  I want you to be

9  quiet now.  I want you to be quiet.

10            THE DEFENDANT:  -- have no immunity when

11  violating a Constitutional right from liability for

12  they are deemed to know the law.  That states very

13  clearly the letter of the law that you don't have --

14            THE COURT:  All right.  Mr. Sueiro, I'm

15  asking you to stop.  Will you stop, or are you going to

16  be removed from the courtroom?

17            THE DEFENDANT:  That's the first reason.

18            THE COURT:  Either you stop, or you're going

19  to be removed from the courtroom.  Do you understand?

20            THE DEFENDANT:  You want me to stop

21  exercising my lawful right --

22            THE COURT:  I want you to stop talking, or

23  you're going to be removed from the courtroom.

24            THE DEFENDANT:  It's my lawful right to do

25  what --

1              THE COURT:  All right.  Remove the defendant,

2    please.

3              THE DEFENDANT:  I am exercising my lawful

4    right, and I didn't even touch on the jurisdiction

5    issue yet.  That's --

6              THE COURT:  All right.

7              THE DEFENDANT:  -- another one.  By the way,

8    I challenge jurisdiction.

9              THE COURT:  All right.

10        (The defendant is removed from the courtroom.)

11             THE COURT:  Mr. Gorokhov, I don't know if

12   there's any alternative other than to proceed to trial

13   with you as counsel.  If he continues to disrupt the

14   proceedings, we'll proceed in his absence.

15             Does the government have any thoughts about

16   how to proceed otherwise?

17             MR. BURKE:  No, Your Honor.  We would defer

18   to the Court.

19             THE COURT:  Okay.  With respect to these

20   motions, have you gotten any discovery in this case?

21             MR. GOROKHOV:  I have, Your Honor.

22             THE COURT:  All right.  Are you still

23   pressing the bill of particulars?

24             MR. GOROKHOV:  Yes, Your Honor.  I have two,

25   I think, fairly specific points on that.

1            THE COURT:  All right.

2            MR. GOROKHOV:  So after receiving the

3    discovery in this case, we also, as Your Honor knows,

4    engaged a forensic expert.  We went to the Fairfax

5    County facility where the evidence is kept, the

6    contraband evidence, and we did kind of a spot-check on

7    some of the files that the government had listed in its

8    reports.

9            What our forensic expert found was that for a

10   lot of these files, there was something called a log

11   file, which is a computer's record that a file at one

12   time existed but not the actual underlying file.  So

13   that's a matter that I didn't put in my motion because

14   our examination happened after the fact.

15           So that's just a further issue, Your Honor,

16   why we need a specific list under each count.  All

17   we're requesting here, Your Honor, is a specific list

18   of documents or files that the government intends to

19   rely on in presenting the case against Mr. Sueiro.

20           The government -- these are -- there are

21   thousands of files, Your Honor, thousands of potential

22   documents.  The only other way for me to get this

23   information is to wait until they have to produce an

24   exhibit list.  And at that point, I can't really --

25   there's not going to be enough time for me to go back

1   and look at this material.

2          THE COURT:  All right.  Let me hear from the

3   government.

4          What's really the objection to providing what

5   appears to be pretty limited and straightforward

6   information as to each count?

7          MR. BURKE:  We've provided all the

8   information.  He's seen the computers that are the

9   basis for the charges, and the indictment says the

10  timeline in which the acts took place.

11         I still don't understand exactly what the

12  request is.  If he wants a list of every file on the

13  computer that we consider to be CP, I mean, I believe

14  there's 1,600 files that are -- that are child

15  pornography on the computer.

16         I don't think at this point -- you know,

17  we're always happy to provide as much help as possible

18  in helping defense counsel review the discovery and

19  zero in on the most relevant materials, but I don't

20  think the government should be required to at this

21  point limit -- say that we're only going to talk about,

22  you know -- of the -- of the 1,600 CP files, we only

23  get to use, you know, the 100 that we identify at trial

24  or the 10 that we identify that -- you know, at this

25  point, the government doesn't need to be limited, I

1  guess, in that sense.

2          THE COURT:  Well, it's not about limiting.

3  It's identifying the offense conduct.

4          I am going to order the government to

5  identify as to each of the four counts the specific

6  videos.  It doesn't have to be the specific images so

7  long as it's the specific videos that are referred to

8  in each count during the period alleged, as well as --

9  I think there should be described how it's alleged that

10  these videos were received.  It seems to me that's

11  fairly straightforward, as well as the manner of the

12  receipt of the materials, which, presumably, were

13  through a particular device.

14          Yes.

15          MR. BURKE:  Your Honor, what we could do,

16  Your Honor, is conduct what we call a reverse proffer

17  where we bring the defense counsel into our laboratory

18  and we have our experts walk them through all of our

19  evidence if that will suffice.

20          THE COURT:  All right.  Mr. Gorokhov, do you

21  want to proceed in that way initially?

22          MR. GOROKHOV:  Your Honor, initially,

23  although I'm skeptical.  As I've said, we have gone to

24  the lab.  I mean, literally, what's happening in this

25  case, Your Honor, is the government is saying there's

1  thousands upon thousands upon thousands of files in

2  this computer.

3          THE COURT:  Right.

4          MR. GOROKHOV:  And who knows which one could

5  be under which specific count or which ones are going

6  to be relied on, which ones are not going to be relied

7  on.

8          And furthermore, Your Honor, as I've -- as

9  I've already stated, what we found out is actually a

10  lot of these so-called files are merely just log files.

11  They don't contain an actual video or image.

12          THE COURT:  Why don't you sit down for a

13  minute.

14          Go ahead.

15          MR. GOROKHOV:  So, Your Honor, that's really

16  the problem.  They're pointing to a pile of many

17  thousands of documents and saying, Any of this could,

18  you know, potentially be in any count.

19          THE COURT:  How many devices are we talking

20  about here that this was received on?

21          MR. BURKE:  There are six devices, Your

22  Honor.

23          THE COURT:  Six?

24          MR. BURKE:  Yes.

25          THE COURT:  All right.  I am going to require

1    that there be a specification as to each of the counts

2    as to which images and which devices are being charged

3    on each of those.

4           All right.  When is our trial date?

5    March 22, is that when it is?

6           MR. BURKE:  March 25, Your Honor.

7           THE COURT:  All right.  Let's try to do that

8    within ten days.  All right.

9           All right.  Anything else?

10          Are you pressing your suppression motion?

11          MR. GOROKHOV:  I am, Your Honor.  The motions

12   were initially filed by prior counsel.

13          THE COURT:  Right.

14          MR. GOROKHOV:  And I had just a few points I

15   wanted to stress without waiving the issues raised in

16   those motions.

17          THE COURT:  All right.

18          MR. GOROKHOV:  All right.  Thank you, Your

19   Honor.

20          So really, the focus of my comments today are

21   going to be what's called the threats warrant -- that

22   was the initial warrant to seize all of the items from

23   the house -- and, subsequently, the forensics warrant,

24   which was the first warrant to examine the items on the

25   computer that eventually led to the discovery of the

1    illegal materials in this case.

2           Now, for purposes of context and clarity, I

3    just wanted to emphasize a couple of things about the

4    background of this case since it's been going on for a

5    while and there are prior state prosecutions.

6           The warrants in this case -- the initial

7    warrant to seize was premised on very specific conduct.

8    It was premised on two threatening e-mails that

9    Mr. Sueiro was alleged to have sent to a specific

10   person, a colleague at his place of work.  They were

11   sent on two specific dates, November 2 and November 4,

12   2014.  That was the entirety of the probable cause on

13   which the warrants in this case were based -- or at

14   least the threats warrant in this case was based, the

15   warrant I'm talking about.

16          Now, these were not -- it's important to know

17   these were not text messages.  These were not phone

18   calls.  These were not letters that were sent, and they

19   weren't even files that were attached to an e-mail.

20   They were just e-mails.  The content of the threat was

21   contained within the e-mail.

22          Now, an arrest warrant for Mr. Sueiro was

23   issued on November 2 after the sending of the first

24   e-mail by the Prince William Police Department, Prince

25   William County, and a warrant was actually executed

1  three days later when Mr. Sueiro was arrested.  That

2  was on November 5, Your Honor.

3           Now, on November 6, Detective Leightley went

4  to the residence where Mr. Sueiro lived, the residence

5  that was ultimately searched.  He spoke with an

6  individual by the name of Daniel Benson, who was the

7  landlord of that residence.  And Mr. Benson told him,

8  according to the Detective Leightley's affidavit, a

9  couple of things.  He told him:  Christopher Sueiro

10  rents a room upstairs in the house.  Christopher Sueiro

11  has a computer in his room that's connected to the

12  Internet.  And I believe he also told him Christopher

13  Sueiro owns a handgun, and I believe it was a ballistic

14  vest or a helmet.

15           The next day Detective Leightley went to the

16  magistrate judge -- state magistrate and swore out an

17  affidavit seeking to seize a very broad category of

18  items.  For example, Your Honor, seeking to seize all

19  electronic devices without reference to who they were

20  owned by, computers, phones, GPS devices, printers,

21  scanners, document -- equipment, plotters -- which I

22  didn't know what a plotter was until I looked it up

23  online -- along with a broad range of documents.

24           So before, Your Honor, addressing the

25  probable cause and how that relates to the breadth of

1    the warrant in this case, there's an initial question

2    of which list of items controls, which list of items

3    did the magistrate judge actually authorize the police

4    to seize in this case.

5            And our position, Your Honor, is that the

6    list of items that controls is actually in the face of

7    the warrant, which is -- it was attached to the motion

8    to suppress as Exhibit 1, and the page I'm referring

9    to, Your Honor, would be the first page of that -- the

10   first page of that document.

11           THE COURT:  All right.  Well, it seems to me

12   we need to have a hearing on this motion.  I don't want

13   to do it in pieces.  You're going to need the officers

14   here; is that right?

15           MR. BURKE:  He is here, Your Honor.

16           THE COURT:  He's here?

17           MR. BURKE:  Yes.

18           THE COURT:  Are you ready to proceed today on

19   this?

20           MR. BURKE:  We are, Your Honor.

21           THE COURT:  Okay.  All right.  Why don't we

22   take a short recess, and then we'll proceed with this.

23           Let me just make clear what I want, and it

24   seems to me straightforward.  If you think there's some

25   conflict or some complexity that I'm not appreciating,

1  what I want designated as to each count is the images

2  that are being charged under that count and the device

3  that are associated with those images.

4          MR. BURKE:  Your Honor, may I be briefly

5  heard on that issue?

6          THE COURT:  Yes.

7          MR. BURKE:  Your Honor, unlike some of the

8  cases that may have come before the Court, in this

9  case, the defendant has -- has quite a volume of child

10  pornography, all of which could -- could constitute

11  evidence of these -- of these offenses.  So designating

12  it all would be effectively impossible.  What we can do

13  is designate representative portions that the

14  government chooses from.  I would note --

15          THE COURT:  I assume you're going to decide

16  what you're going to be presenting at trial.

17          MR. BURKE:  We are, Your Honor, but the case

18  law is clear that the government is not required to

19  produce an advance exhibit list for defense.

20          THE COURT:  I understand.  But out of this

21  volume, from what I understand, I think in fairness,

22  you need to at least segregate as to count what images

23  fall within each count and which devices are associated

24  with each count.

25          MR. BURKE:  Your Honor, we have made the

1  devices available to the defendant, and we've offered

2  to walk them through all of the evidence.  The courts

3  have held that that is the best way of the defense

4  making themselves apprised of the evidence.

5          They -- his expert -- they were only there

6  for a couple of hours.  They could be there for as long

7  as they'd like.  They can examine every device top to

8  bottom with an expert for days, weeks, whatever they'd

9  prefer.  They are electing not to do that.

10          THE COURT:  Well, without limiting the

11  government, what's the difficulty in simply identifying

12  as to each count which images fall within each count?

13          MR. BURKE:  Because, Your Honor, we did not

14  charge --

15          THE COURT:  I assume you've done that

16  analysis yourself.

17          MR. BURKE:  We have not selected yet, Your

18  Honor --

19          THE COURT:  I understand that.

20          MR. BURKE:  -- exactly the ones --

21          THE COURT:  You haven't grouped them by

22  count?

23          MR. BURKE:  Your Honor, there is so much

24  evidence per count that we haven't -- to do that would

25  be effectively impossible.  So when we get closer to

 1  trial, we'll go and identify representative exhibits

 2  that we will then present to the jury.  We intend to

 3  offer testimony that there are many, many, many, many

 4  more images that could constitute substantive evidence

 5  of the offenses.  And then we'd submit the devices to

 6  the jury so that the jury, if they'd like, could get an

 7  expert in here and go through it top to bottom if

 8  they'd like to.  So that's typically how we proceed in

 9  these cases, and so a bill of particulars is quite

10  unusual in a child pornography case.

11           THE COURT:  Well, let me do this:  Why don't

12  you do the reverse proffer --

13           MR. BURKE:  Okay.

14           THE COURT:  -- that you've talked about.

15           And then ten days before trial, I do want a

16  designation as to count of which images are going to be

17  presented.

18           MR. BURKE:  I understand, Your Honor.

19           I will say one thing with respect to Count 3,

20  that's an attempt count.  So there may not be --

21           THE COURT:  All right.

22           MR. BURKE:  -- substantive images with

23  respect to Count 3.

24           Count 4 is a promotion and solicitation

25  count.  So for those counts, it's -- the crime is the

1  defendant's solicitation of the content, not the

2  content itself.

3          THE COURT:  All right.

4          MR. BURKE:  So I'll just clarify that.

5          But yes, Your Honor, I think that that makes

6  sense.

7          THE COURT:  All right.  Let's do it that way.

8          Mr. Gorokhov.

9          MR. GOROKHOV:  Your Honor, just briefly, and

10 I apologize.  And, again, I appreciate the offer of the

11 reverse proffer, and we'll take that offer.  It's

12 something I would never decline.

13         But just as a practical matter, Your Honor,

14 what we have here -- and I have spoken to my expert

15 about this.  For him, he said it would take just

16 hundreds of hours to go through, and that's a lot of

17 money to pay an expert for something that the

18 government ultimately has to do before trial anyway.

19         They're ultimately going to have to decide:

20 This is what we're going to show the jury.  It's work

21 that they're ultimately going to have to do anyway,

22 Your Honor, and they've had this case for over a year

23 now.

24         So, really, what we're going to be doing is

25 spending a lot of CJA funds to have an expert going

1  through a computer looking at things the majority of

2  which are just log files that don't even have an image

3  attached to it.

4        The other issue here, Your Honor, is that,

5  you know, there's -- there's a lot of cases, especially

6  in the white-collar context, where courts have required

7  the government in complex cases with a lot of documents

8  to turn over what they're going to use prior to trial

9  in a much longer period of time prior to trial.  And I

10 think this case is exactly analogous to that,

11 particularly, also, because I don't have the assistance

12 of my client, Your Honor.

13        THE COURT:  All right.  Well, I am going to

14 adhere to what I've indicated, which is I want you to

15 do a reverse proffer.  By reverse proffer, I'm

16 expecting this to be pretty specific, as best you can

17 at this point, of what images you're going to be

18 presenting.  I don't need the logs.  Cut through the

19 logs.  Show the images and the devices.  And then ten

20 days before trial, I do want what you're going to

21 introduce at trial by way of your case in chief as far

22 as the images on each of the counts.

23        MR. BURKE:  Understood, Your Honor, with the

24 understanding those are representative samples and not

25 all the substantive evidence for each count.

1          THE COURT:  Well, I understand that.

2          MR. BURKE:  Okay.

3          THE COURT:  But the representative samples

4  are what you're going to be introducing, I take it.

5          MR. BURKE:  Yes, Your Honor.

6          THE COURT:  All right.

7          MR. BURKE:  All right.  Thank you.

8          THE COURT:  All right.  Let me just for the

9  record overrule what was filed by Mr. Sueiro as to his

10  motion to dismiss based on the Speedy Trial Act.  The

11  motion to dismiss in this case was filed in April of

12  last year.  There's also been mental examinations down

13  in Butner that have tolled the statute, and there's no

14  speedy trial issue in this case.

15          All right.  Let's take a short recess.  Then

16  we'll proceed with the motion to dismiss.

17      (Recess from 11:23 a.m. until 11:40 a.m.)

18      (The defendant is not present.)

19          THE COURT:  Before we begin, I understand you

20  passed on to Mr. Sueiro the Court's communication that

21  he could return here and rejoin us if he was prepared

22  not to be disruptive.  Is that correct?

23          THE MARSHAL:  Yes, sir.

24          THE COURT:  Why don't you for the record tell

25  us his response.

1           THE MARSHAL:  Right.  The only thing he would

2    say in response is that he was exercising his legal

3    right to represent himself.  And when asked if he would

4    continue to speak the same way he did during his last

5    appearance here, he really wouldn't answer that.  He

6    just continued to say it was his right to represent

7    himself and his right to be here.  He really did not

8    elaborate as to how he would conduct himself if he came

9    back up here.

10           THE COURT:  All right.  Thank you.

11           THE MARSHAL:  Yes, sir.

12           THE COURT:  All right.  Are you ready to

13   proceed?

14           MR. BURKE:  Yes, Your Honor.

15           THE COURT:  All right.  Counsel.

16           MR. BURKE:  Your Honor, the government calls

17   Detective Trey Leightley.

18           THE COURT:  All right.  Detective Leightley.

19       ALBERT LEIGHTLEY, PLAINTIFF'S WITNESS, AFFIRMED

20                     DIRECT EXAMINATION

21   BY MR. BURKE:

22   Q    Detective Leightley, can you please state and

23   spell your name for the record?

24   A    My first name is actually Albert, A-L-B-E-R-T.  My

25   last name is Leightley spelled L-E-I-G-H-T, as in Tom,

1  L-E-Y.

2  Q    Detective Leightley, where are you employed?

3  A    I am with the Fairfax County Police Department.

4  Q    How long have you worked there?

5  A    Almost 26 and a half years.

6  Q    What is your current position there?

7  A    I specialize in two things, computer forensics,

8  digital evidence, as well as I.T., processing major

9  crime scenes for the City of Fairfax.

10 Q    Have you investigated crimes related to threats of

11 harm to people?

12 A    Yes, in regards to myself, as well as to the

13 forensic analysis that other people give me, doing the

14 forensic analysis.

15 Q    Can you estimate for me about how many threats

16 cases you've investigated or participated in?

17 A    It's increased greatly since the Twitter cases and

18 threats to schools.  So right now about 10 to 15

19 recently.

20 Q    Have you investigated crimes related to child

21 exploitation offenses to include child pornography

22 cases?

23 A    Yes.  I'm a trained forensic examiner.  I've been

24 trained by the federal government, HSI, and I do

25 computer forensics work for Charlottesville, UVA.

1   Fairfax County brings me their stuff, and I've done

2   roughly about 40 to 50 cases of child pornography.

3   Q    I'm sorry.  Did you say 40 to 50?

4   A    Forty to fifty approximately.

5   Q    All right.  What are your duties and

6   responsibilities in having this job?

7   A    Primarily is to assist in the collection of the

8   evidence at the location of the search warrants if it

9   involves digital evidence, and then I bring the digital

10  evidence back to my lab.  At that point in time, I

11  conduct a forensic analysis of the digital evidence.

12  Q    Do your duties and responsibilities include

13  obtaining, swearing out, and executing search warrants?

14  A    Yes, sir.

15  Q    If you had to say approximately how many search

16  warrants you've executed in your career, how many would

17  that be?

18  A    Over a hundred.

19  Q    As part of your duties and responsibilities, are

20  you familiar with the investigation of Christopher

21  Robert Sueiro?

22  A    Yes, sir.

23  Q    Is the information you're going to provide the

24  Court today the result of that investigation?

25  A    Yes, sir.

1    Q    Have you learned this information either directly

2    from your own involvement or from other law enforcement

3    officers or witnesses?

4    A    Yes, sir.

5    Q    Am I correct in understanding that you're not

6    going to present to the Court today all of the relevant

7    information you've learned throughout the course of

8    this investigation?

9    A    Yes, sir.

10   Q    Can you please describe for the Court how the

11   Sueiro state investigation started?

12   A    It was a joint investigation between the City of

13   Fairfax and Prince William County.  I was asked by my

14   supervisor to assist in obtaining a search warrant for

15   evidence relating to the threats that were sent via

16   e-mail, and I assisted in obtaining that search

17   warrant.

18   Q    Can you tell the Court a little bit about the

19   threats case initially?

20   A    The threats case involved a coworker.  Mr. Sueiro

21   worked at what is called the Best Western in the city

22   of Fairfax.  And he had sent repeatedly long e-mails

23   saying how he was going to kill his coworker, and this

24   is done via e-mail.

25   Q    Did you review these threatening e-mails prior to

1  obtaining a search warrant for Mr. Sueiro's home?

2  A    Yes.  I brought the victims back into

3  headquarters, conducted another interview, and they

4  provided me with the e-mails.

5  Q    Did law enforcement officials obtain an arrest

6  warrant for the defendant?

7  A    Both Fairfax City and Prince William County had.

8  Q    Do you recall when they executed that arrest

9  warrant?

10  A    Approximately November 5, I believe.

11  Q    Did you procure a search warrant for his residence

12  based on the threatening e-mails?

13  A    Yes.

14  Q    This was after the arrest warrant was executed?

15  A    Yes.

16  Q    So the defendant was not in the home?

17  A    No.

18  Q    I'm showing you what's previously been marked --

19       Excuse me.

20            MR. BURKE:  The Court's indulgence.

21  BY MR. BURKE:

22  Q    -- as Government Exhibit 1 with the assistance of

23  the court security officer.

24            MR. BURKE:  Your Honor, I have a copy for the

25  Court.

1              THE COURT:  All right.

2  BY MR. BURKE:

3  Q    Would you take a moment to review that and let me

4  know --

5  A    Yes.  Yes, sir.

6  Q    Can you tell the Court what that is?

7  A    What this is is my initial search warrant.  It's

8  an affidavit with regards to my probable cause in

9  relations to executing the search warrant for the home

10 associated with Mr. Christopher Sueiro.

11 Q    So this is the first search warrant you obtained

12 in this case?

13 A    Yes, sir.

14        MR. BURKE:  Your Honor, I'd ask that

15 Government Exhibit 1 be admitted into evidence.

16        THE COURT:  Any objection?

17        MR. GOROKHOV:  No, sir.

18        THE COURT:  Without objection, Government

19 Exhibit 1 is admitted.

20 BY MR. BURKE:

21 Q    Detective Leightley, can you please describe

22 briefly for the Court how you go about obtaining search

23 warrants in your jurisdiction?

24 A    At first we type out a long affidavit.  It's a

25 probable cause statement.  And then what I do is then

1  fill out -- there's two forms associated.  There's an

2  affidavit form, and then there's a search warrant form.

3  I fill in the blocks that are in that form, and then

4  after that, I bring it over to the magistrate's office.

5  The magistrate's office then reviews the search warrant

6  and decides whether or not to sign off on the search

7  warrant.

8  Q    Detective Leightley, please look at the second

9  page of Government's Exhibit 1.

10 A    Yes.

11 Q    It's marked as page 2 at the top.

12 A    Yes.

13 Q    Is that the form that you filled in -- I'm

14 sorry -- the search warrant form that you filled in?

15 A    Yes.

16 Q    Did you fill in the empty fields on that form?

17 A    Yes.

18 Q    Did those fields that you filled out include the

19 property you were seeking to search?

20 A    Yes.

21 Q    Did you fill out any fields about what crime you

22 were investigating?

23 A    Yes.

24 Q    And that's also on there?

25 A    Yes.

1  Q    In Government's Exhibit 1, what property were you

2  seeking to search?

3  A    Ballistic equipment.  That included vests -- a

4  ballistic vest and a ballistic helmet, firearms,

5  documents, and digital evidence, specifically

6  computers, cell phones.

7  Q    On that form, what crimes did you list that you

8  were seeking that property to find evidence of?

9  A    Violation of 18.2-60 of Code of Virginia, threats

10 of death or bodily injury.

11 Q    And is all that information on this page of the

12 warrant?

13 A    Yes.

14 Q    Detective Leightley, was this search warrant

15 accompanied by the attached affidavit when you swore it

16 out?

17 A    Yes.

18 Q    I'm sorry.  I need to go back to the warrant.

19      On page 2 again, Detective Leightley, did you name

20 the defendant on that page of the warrant?

21 A    Yes.  It says in the -- over on the right-hand

22 side, in reference to Mr. Christopher Sueiro, and it

23 has the address.

24 Q    Detective Leightley, was the accompanying -- was

25 this search warrant you filled out that you were just

1    describing accompanied by an attached affidavit when

2    you swore it out?

3    A    Yes.

4    Q    That's the affidavit that's part of Government's

5    Exhibit 1?

6    A    Yes.

7    Q    Does this search warrant authorize you to seize

8    and search electronic devices in the defendant's home?

9    A    Yes.

10   Q    Did you participate in the execution of this first

11   warrant at the defendant's residence?

12   A    Yes.

13   Q    Where did you search that day?

14   A    Primarily, the evidence was in a room associated

15   with Mr. Christopher Sueiro, as well as a common area.

16   He had belongings that were in a living room and in the

17   dining room.

18   Q    And what did you seize?

19   A    I seized digital evidence, laptop computers,

20   external hard drives, a firearm, a ballistic vest, and

21   a ballistic helmet.

22   Q    How many relevant devices did you find in

23   Mr. Sueiro's bedroom?

24   A    Five.

25   Q    Okay.  Did you obtain a second search warrant in

1  this case?

2  A    Yes.

3  Q    All right.  I'm showing you with the assistance of

4  the court security officer what's been previously

5  marked as Government Exhibit 2.

6       Did you seize any devices that belonged to the

7  roommates, the other people who lived in the home?

8  A    No.

9       MR. BURKE:  Your Honor, I have a copy for the

10  Court if you would like.

11       THE COURT:  All right.  Any objection?

12       MR. GOROKHOV:  No objection, Your Honor.

13       THE COURT:  Without objection, is this

14  Government Exhibit 2?

15       MR. BURKE:  Yes, Your Honor.

16       THE COURT:  All right.  It's admitted in this

17  hearing.

18  BY MR. BURKE:

19  Q    Detective Leightley, once you've reviewed that,

20  please let me know, and I'll continue my questioning.

21  A    Okay.  This is the second search warrant I

22  obtained.  The evidence that was collected at the scene

23  was placed into property.  I then obtained a secondary

24  search warrant in order to conduct an analysis of the

25  digital evidence associated with what was seized at the

1  home.

2         MR. BURKE:  Now, I believe the Court has

3  already done this, but just for the record, I would ask

4  that this be admitted into evidence.

5         THE COURT:  It's admitted.

6         MR. BURKE:  Okay.

7  BY MR. BURKE:

8  Q    Does the search warrant -- does this search

9  warrant, known as Exhibit 2, describe the property you

10  aimed to search?

11  A    Yes.

12  Q    Does it also describe the crime that you wanted to

13  search for evidence of?

14  A    Yes.

15  Q    Was this search warrant accompanied by an attached

16  affidavit when it was sworn out?

17  A    Yes.

18  Q    Why did you obtain the second search warrant?

19  A    It was out of an abundance of caution.  At the

20  time, it was -- it was an abundance of caution.  At the

21  time, there were rumors going around through the

22  circuit court that suppression motions were being

23  filed, that, well, you've got the right to seize it but

24  then you didn't have the right to analyze it.  So it

25  was under an abundance of caution to prevent another --

1   a suppression hearing that I got a secondary search

2   warrant on the specific items that I had seized.

3   Q     It is still your practice to get these

4   abundance-of-caution ones?

5   A     No.  The magistrates prefer I don't do that.

6   Q     Did the first search warrant authorize you to

7   search these devices?

8   A     Yes.

9            THE COURT:  Who actually prepared these

10  search warrants?

11           THE WITNESS:  I did, Your Honor.

12  BY MR. BURKE:

13  Q     Did you execute these warrants on the defendant's

14  devices at some point?

15  A     Yes.

16  Q     And that was to search for what sort of evidence?

17  A     Evidence related to the crimes of threats to kill.

18  Q     Can you describe what happened next?

19  A     I created a forensic image of the machine.  I

20  placed it into my forensic software.  I then looked

21  through a folder within that device in My Documents, My

22  Pictures folder, and I saw evidence related to

23  prepubescent boys.

24  Q     So is it your testimony you discovered child

25  pornography in the course of executing a search?

1   A    Yes, sir.

2   Q    What did you do after you discovered the child

3   pornography?

4   A    I stopped, and then I obtained another search

5   warrant so that I could continue my analysis.

6   Q    That's because you did not specifically have

7   probable cause to search for child pornography at this

8   point, right?

9   A    Anything that I was looking for specifically in

10  regards to threats.  I couldn't do any keyword

11  searches, hashtags related to child pornography.

12            MR. BURKE:  Your Honor, with the assistance

13  of the court security officer, I'm introducing

14  Government's Exhibit 3.

15            THE COURT:  All right.

16  BY MR. BURKE:

17  Q    Detective Leightley, once you've reviewed that,

18  please let me know.

19  A    Again, this is the search warrant that I

20  obtained -- I'm sorry.

21  Q    What -- please describe it.

22  A    It's a search warrant that I obtained in regards

23  to the -- now changing it from crime of threats to

24  violent harm, conduct forensic analysis on production

25  of child pornography.

1            MR. BURKE:  Your Honor, for the purpose of

2    this hearing, I ask that Government's Exhibit 3 --

3            THE COURT:  Any objection?

4            MR. GOROKHOV:  No.

5            THE COURT:  Without objection, Exhibit 3 is

6    admitted.

7    BY MR. BURKE:

8    Q    Detective Leightley, does that search warrant

9    describe the property you wanted to search?

10   A    Yes.

11   Q    Does it also describe the crime you wanted to

12   search for evidence of?

13   A    Yes.

14   Q    What crime is that?

15   A    Now, it's changed from -- well, I still had the

16   one threats to bodily kill, but this one specifically

17   allowed me to also search for crimes involving

18   production and possession of child pornography.

19   Q    And is the defendant's name on the face of that

20   warrant with respect to those crimes as well?

21   A    Yes.

22   Q    Detective Leightley, did an affidavit accompany

23   this search warrant when you swore it out?

24   A    Yes.

25   Q    Did law enforcement obtain any other devices from

1  the defendant's residence that you did not seize during

2  the execution of the residential search warrant?

3  A    Yeah.  Approximately -- let's me see -- November,

4  December, January -- February I was contacted by

5  detective -- I mean officer -- officer -- the roommate,

6  Mr. Benson.  Mr. Benson was in the process of with

7  Mr. Sueiro's brother cleaning out his items from the

8  residence.  He found within the items in the living

9  room a box.  In the box was an external hard drive.

10  Mr. Benson decided to hook that device up to his

11  computer, and he immediately noticed child pornography.

12  He contacted me.  I went to the residence, and I seized

13  that device.

14  Q    Did you obtain a separate search warrant for that

15  device before you examined it?

16  A    Yes.

17       MR. BURKE:  With the assistance of the court

18  security officer, Your Honor, I'm handing up

19  Government's Exhibit 4.

20       THE COURT:  All right.

21  BY MR. BURKE:

22  Q    Detective Leightley, once you've reviewed that,

23  please let me know.

24  A    Yes.  This is the search warrant associated with

25  the external hard drive that was brought to me and

1   placed into evidence.

2   Q    Does that search warrant describe the property you

3   wanted to search?

4   A    Yes.

5   Q    Does it describe also the crime you wanted to

6   search it for evidence of?

7   A    Yes.

8   Q    Does it have the defendant's name on it?

9   A    Yes.

10          MR. BURKE:  Your Honor, I'd ask that

11  Government's Exhibit 4 be admitted.

12          THE COURT:  Any objection?

13          MR. GOROKHOV:  No objection.

14          THE COURT:  Without objection, Government's

15  Exhibit 4 is admitted.

16  BY MR. BURKE:

17  Q    Detective Leightley, did an affidavit accompany

18  this search warrant when you swore it out?

19  A    Yes.

20  Q    Did you execute this warrant?

21  A    Yes.

22  Q    Were any federal search warrants obtained in this

23  case?

24  A    Yes.

25  Q    Did you assist in drafting a federal search

1  warrant and an affidavit that accompanied it?

2  A    Yes.

3  Q    Did you swear out that warrant itself?

4  A    No.

5  Q    But you reviewed the warrant and the affidavit

6  before it was sworn out; is that correct?

7  A    Yes.

8  Q    Did you -- did it appear to be accurate and to the

9  best of your knowledge and belief at that time?

10 A    Yes.

11         MR. BURKE:  All right.  With the assistance

12 of the court security officer, Your Honor, I'm handing

13 up Government's Exhibit 5.

14 BY MR. BURKE:

15 Q    Detective Leightley, once you've reviewed that,

16 please let me know.

17 A    This is the affidavit in support of the search

18 warrant that was sworn out by Special Agent Cormick

19 (phonetic) and that I reviewed.  I think she now goes

20 by the name of Honicker.

21 Q    Spelled H-O-N-I-C-K-E-R?

22 A    Yes.

23         MR. BURKE:  Your Honor, I would ask that

24 Government's Exhibit 5 be admitted into evidence.

25         THE COURT:  Any objection?

```
1              MR. GOROKHOV:  No objection.

2              THE COURT:  Without objection, Exhibit 5 is

3    admitted.

4    BY MR. BURKE:

5    Q    Detective Leightley, does Government's Exhibit 5

6    appear to be the same affidavit you reviewed for the

7    federal search warrant that was obtained in this case?

8    A    It does.

9    Q    Detective, when you executed the state search

10   warrants in this case, did you perceive any defects in

11   them?

12   A    No.

13   Q    Any errors?

14   A    No.

15   Q    Were you aware of any reason why any of the

16   magistrates before whom you appeared might have an

17   improper motive in granting these warrants to you?

18   A    No.

19   Q    What was your belief about the validity of these

20   warrants when you executed them?

21   A    That they were valid.

22             MR. BURKE:  I have no further questions, Your

23   Honor.

24             THE COURT:  All right.  Mr. Gorokhov.

25             MR. GOROKHOV:  Yes, Your Honor.
```

```
 1                    CROSS-EXAMINATION

 2   BY MR. GOROKHOV:

 3   Q    Good afternoon, Detective Leightley.

 4   A    Yes, sir.

 5   Q    I have a couple of preliminary questions about the

 6   threats case with respect to Mr. Sueiro.

 7   A    Okay.

 8   Q    So when did you first learn about the alleged

 9   threats that Mr. Sueiro sent to his coworker?

10   A    It was about two or three days, I believe,

11   approximately afterwards.  This was initially handled

12   by both Fairfax City and Prince William patrol

13   officers.  So I came in -- within a day or so my

14   supervisor asked me if I could assist in obtaining

15   digital evidence associated with these incidents.

16   Q    Okay.  Now, you became familiar with the facts of

17   those threats, right?

18   A    Correct.  I met with Ms. Olsen and Mr. Olsen.

19   They came to my headquarters.  And I interviewed them,

20   and they provided me with the e-mails.

21   Q    Okay.  You learned as a part of that investigation

22   that they were threats sent by e-mail, correct?

23   A    Yes.

24   Q    The message containing the alleged threat was in

25   the body of the e-mail itself, right?
```

1  A     Yes.

2  Q     There was no information to your knowledge that

3  Mr. Sueiro sent a threatening text, for example, to

4  anybody, right?

5  A     A text message?  No.

6  Q     And there was no information that Mr. Sueiro sent

7  a written threat to anybody, right?  I mean like a

8  letter.  When I say "written," I mean outside of

9  e-mail.

10 A     You mean like an attachment or Word document

11 attachment, that sort of thing?

12 Q     Yes.

13 A     No.

14 Q     Or that he mailed a hard copy letter threat to

15 anybody, right?

16 A     No.  He's mailed letters but not threats.  He's

17 mailed letters to different people but not threats.

18 Q     Okay.  That was -- in fact, he's mailed a letter

19 to Ms. Olsen, but that was after the execution of the

20 search warrant in this case, right?

21 A     Yes, sir.

22 Q     Okay.  Now, in terms of the arrest warrant, the

23 initial arrest warrant for Mr. Sueiro was obtained by

24 Prince William County; is that right?

25 A     I believe they were obtained simultaneously

1   between the Fairfax City patrol officer and Prince

2   William County officer.  Who got the initial one, I

3   can't remember.

4   Q    Okay.  And is it in your affidavit, though, that

5   the -- that the arrest warrant against Mr. Sueiro was

6   obtained by Prince William County?  Is that something

7   you put in your affidavit?

8   A    I believe so, yes.

9   Q    Okay.  And, in fact, your affidavit reflects that

10  it was obtained on November 2, 2014; is that right?

11  A    Yes.

12  Q    And that was the date the first threatening

13  message to Ms. Olsen was sent, correct?

14  A    Yes.

15  Q    But the arrest warrant was not executed until

16  three days later on November 5; is that right?

17  A    Yes.

18  Q    2014, correct?

19  A    Yes.

20  Q    Okay.  Now, directing your attention to the actual

21  investigation you conducted in this case, prior to

22  obtaining the warrant in this case, can you just give

23  me an idea of the investigation that you conducted?

24  A    I met with the victims.  I went over the e-mails.

25  I discussed what was the -- what was the rationale for

1  why these e-mails were sent.  I asked, Do you recognize

2  the e-mail account that it was sent from?  And she said

3  yes, and she provided me with the e-mails.

4  Q    Okay.  Now, aside from talking to the recipient of

5  the e-mails, you also spoke with Daniel Benson; is that

6  right?

7  A    Correct.

8  Q    And Daniel Benson was a person who was the

9  landlord of the house that Mr. Sueiro rented a room in?

10 A    Yes, sir.

11 Q    And did you go to speak with Mr. Benson at that

12 residence?

13 A    Yes.

14 Q    And, in fact, Mr. Benson resides there too; does

15 he not?

16 A    Yes.  I believe he's the homeowner, and he lives

17 there as well.

18 Q    Okay.  That was on November 6, 2014, correct?

19 A    Yes.

20 Q    And on that date, Mr. Benson told you a couple of

21 things about Mr. Sueiro, right?

22 A    Yes.  He said that he had a room that was in the

23 upstairs, as well as he had possessions that were in

24 the living room.

25 Q    Okay.  Did he tell you also that Mr. Sueiro had a

1  computer in his room?  Did he not?

2  A    Yes.

3  Q    And he told you that computer was connected to the

4  Internet, correct?

5  A    Yes.

6  Q    He also told you that Mr. Sueiro had a ballistic

7  vest, I believe.  Right?

8  A    Yes.

9  Q    And that Mr. Sueiro owned a handgun?

10  A    Yes.

11  Q    He specified -- I believe you already said this,

12  but I just want to make sure the record was clear.  He

13  specified that Mr. Sueiro rented a room in that

14  residence, correct?

15  A    Yes.

16  Q    Now, I want to ask you about the -- about some of

17  the items that appear on the warrant itself.  Now, do

18  you need a copy of it to --

19  A    I have them here.

20  Q    Oh, you do have it.  Okay.  So this would be

21  Government's Exhibit 1, and I'm referring now to

22  Attachment C.

23  A    Yes, sir.

24  Q    Now, prior to obtaining the warrant -- I

25  apologize.  So Attachment C is before you now?

1  A    Yes.   Attachment C, a list of items to be seized.

2  Q    Right.   Exactly.

3      Now, before obtaining this warrant in this case,

4  did you get information from Mr. Benson that

5  Christopher Sueiro owned a mobile phone?

6  A    No.   I believe Ms. Olsen did not believe he owned

7  one.

8  Q    Okay.   So, in fact, the information you had was

9  that Mr. Sueiro did not own a mobile phone?

10 A    They did not know that, if he did or didn't, but

11 they were under the impression that he did not.

12 Q    That he did not.   Okay.

13      And did you receive information from Mr. Benson,

14 Ms. Olsen, or anyone else that Mr. Sueiro owned a GPS

15 device?

16 A    A GPS device?   No.

17 Q    Did you receive information from Mr. Benson,

18 Ms. Olsen, or -- and I understand that it's a lot of

19 people but basically from anybody --

20 A    Right.

21 Q    Did you receive information that Mr. Sueiro owned

22 a printer?

23 A    A printer?   No.   I didn't ask about printers.

24 Q    Okay.   Did you receive any information that

25 Mr. Sueiro owned a DVD, that he owned DVDs?

1   A      I did not ask that question.

2   Q      Okay.  And finally -- I'm not going to go through

3   this whole list -- but did you receive information from

4   any witnesses that Mr. Sueiro owned digital media

5   storage devices, external hard drives, in other words?

6   A      Other than computers, that's the only thing I

7   knew.

8   Q      You only knew that he had a computer; is that

9   right?

10  A      Yes.

11  Q      Okay.  Now, I'm going to ask you about the

12  actual -- when you swore out the warrant in this case.

13  Your testimony was that you filled out both the warrant

14  and prepared the affidavit in support of the warrant,

15  right?

16  A      Yes, sir.

17  Q      So the language that appears on the face of the

18  warrant in this case was not prepared by the magistrate

19  judge.  It was actually written by you but approved by

20  the magistrate judge?

21  A      Yes.  That's how it's done in Fairfax.

22  Q      Okay.  Now, I want to ask you about the execution

23  of the search warrant in this case.  That happened on

24  the following day, on November 7, 2014, correct?

25  A      Yes, sir.

1  Q     And on that day, were you the one -- strike that.

2        You participated in that search, correct?

3  A     Yes, sir.

4  Q     Who did you present the search warrant to?

5  A     After it was -- explain what that meant, in

6  particular.

7  Q     Okay.  Well, let's back up.  So in order to

8  execute the search, you went to the residence where

9  Mr. Sueiro lived, right?

10 A     I laid a copy of that search warrant in the house.

11 Q     You laid a copy in the house?

12 A     Yes, sir.

13 Q     Okay.  What did that search warrant -- what did

14 that search warrant look like when you laid it in the

15 house?

16 A     Exactly what you have, including an inventory

17 sheet.

18 Q     Okay.  So it had the warrant, an inventory sheet.

19 Anything else?

20 A     The affidavit.

21 Q     The affidavit was attached to that warrant --

22 A     Yes.

23 Q     -- at the time it was --

24 A     Yes.

25 Q     -- executed?

1  A     Yes.

2  Q     Okay.  Now, during the search, in fact, Daniel

3  Benson -- you relied on Daniel Benson to show you where

4  Mr. Sueiro's room was, right?

5  A     Uh-huh, yes.

6  Q     Okay.  Now, you testified about some of the items

7  that were seized in this case, and I want to ask you in

8  particular about documents.  One of the categories of

9  items that you seized in this case were paper

10 documents, right?

11 A     Correct.

12 Q     And can you give this Court a description of what

13 paper documents were seized?

14 A     I'm just going from memory, but I know there was

15 a -- one or two documents about -- they printed out in

16 regards to missing some sort of *Star Wars* book as I

17 remember.

18 Q     Okay.

19 A     That's the one that sticks out more than anything.

20 Q     Okay.  And did you seize all of the paper

21 documents in his room?

22 A     Every single one, no.

23 Q     Okay.  Did you -- how did you determine which

24 documents you would seize?

25 A     If they were affiliated with either -- looking for

1  if there were any bills in regards to Internet or --

2  any -- any bills or whatever associated with -- if he

3  was paying for the bills for the Internet or if it was

4  specifically anything related to the Best Western.

5  Q    Okay.  And that *Star Wars* -- *Star Wars* book you --

6  or the *Star Wars* document you seized, was that related

7  to the Best Western?

8  A    Yeah.  It claims that someone may have stolen his

9  *Star Wars* book, and he had printed out a letter.  I

10 think he may have posted it at the Best Western.

11 Q    Now, when you were making a determinative -- a

12 determination of what documents to seize and you talked

13 about things related to work and things related to

14 Internet, how did you make that determination?

15 A    I was probably putting it more into context as

16 work and to his employment at the Best Western.  That's

17 what I was strictly looking at.  Or if there were any

18 e-mails that had been printed out or any documents with

19 Mr. and Mrs. Olsen's name on it.

20 Q    Okay.  So is it fair to say you kind of had to use

21 your judgment when you were seizing documents?

22 A    When it comes to documents, yes.

23 Q    You had to rely on your judgment?

24 A    Yes.

25 Q    Okay.  Now, I want to ask you about the forensics

1  warrant in this case, which is the Government's

2  Exhibit 2.

3  A    Yes.

4  Q    And I want to -- first of all, I want to ask you

5  about --

6          MR. GOROKHOV:  The Court's indulgence, Your

7  Honor.

8          I apologize for that.

9  BY MR. GOROKHOV:

10  Q    Going back to your investigation of the -- of the

11  threats in this case, did you find -- in your

12  investigation find out that Mr. Sueiro -- prior to the

13  execution of the search warrant in this case, did you

14  find information that Mr. Sueiro was searching for

15  Ms. Olsen's address?

16  A    I just -- Google searches -- as I remember -- I'd

17  have to go back through, but I know specifically it was

18  Facebook searches in regards to Tiffany Olsen.

19  Q    Okay.  I just want to be clear here.  This is

20  before -- I'm talking about the time period before you

21  looked at any computers.

22  A    So -- no, I would not be able to do that.

23  Q    Okay.  So you did not receive information, for

24  example, from Tiffany Olsen or -- Tiffany Olsen --

25          I believe her name was Tiffany, right?

1   A    Yes.

2   Q    -- or any other witness that Mr. Sueiro was

3   looking for her address, for example?

4   A    No.  And basically, most of this is based on

5   e-mails when he kept referring to what is called "the

6   plan."

7   Q    Okay.

8   A    In terms of the plan, you'd think okay, what does

9   a person do in order to plan to accomplish their -- you

10  know, in this case, threats to kill.  You know, are

11  they going to do surveillance?  Are they going to go by

12  the house, that sort of thing.  Everything was

13  referencing to the e-mails themselves.

14  Q    Okay.  Now, did you have any information that

15  Mr. Sueiro, in fact, had images of Ms. Olsen --

16  possessed images of Ms. Olsen?

17  A    Prior to the analysis?

18  Q    Correct.

19  A    No.

20  Q    Did you have any information from your

21  investigation that Mr. Sueiro had Ms. Olsen's address

22  or anything like that in his contacts?

23  A    No.  Again, it all reverted back to the plan, what

24  he stated in the e-mails that he had a plan and that he

25  was going to carry it out, that's what I -- based on

1   training and experience that this person would take to

2   this level.

3   Q    Okay.  Did you have any information that

4   Mr. Sueiro was having created, printed, or written

5   materials that would reflect a plan to harm Ms. Olsen?

6   A    Did I -- no.  It was just -- everything was based

7   off of the content and the verbiage of the e-mails.

8            MR. GOROKHOV:  Okay.  Your Honor, at this

9   time, that's all I have.

10           THE COURT:  All right.  Any redirect?

11           MR. BURKE:  No, Your Honor.

12           THE COURT:  All right.  Detective, let me ask

13  this:  I take it that when you conducted these

14  searches, you searched, as I understand your testimony,

15  the room you understood Mr. Sueiro was renting as the

16  bedroom and then the common areas; is that right?

17           THE WITNESS:  Yes.  There was a living room

18  where he had stored a lot of packages, and then there

19  was a dining room table which he periodically,

20  supposedly, would work at with his computer.  And there

21  was a device that was sort of crusted into the dining

22  room table that belonged to him.

23           THE COURT:  Did you search any other

24  bedrooms?

25           THE WITNESS:  No.

1                  THE COURT:  All right.  Thank you.

2                  May the detective be excused?

3                  MR. BURKE:  Yes, Your Honor.

4                  THE COURT:  All right.  You're excused.

5                  MR. BURKE:  No further witnesses from the

6    government.

7                  THE COURT:  All right.  Thank you for

8    appearing.

9         (The witness stands aside.)

10                 THE COURT:  All right.  Mr. Gorokhov,

11   anything you want to present?

12                 MR. GOROKHOV:  Yes, Your Honor, if I may

13   proceed with argument.

14                 THE COURT:  Yes.

15                 MR. GOROKHOV:  Thank you.

16                 Your Honor, I think the threshold question in

17   this case is what language -- in terms of the probable

18   cause and the overbreadth of the warrant, what language

19   should we be looking at?  Should we be looking at the

20   language on the face of the warrant, or should we be

21   looking at the language in the affidavit?  Because the

22   language in the affidavit is actually different than

23   the language on the face of the warrant.

24                 I recognize that the Fourth Circuit case law

25   says that either -- if the face of the affidavit

1    incorporates -- the face of the warrant incorporates

2    the affidavit or the affidavit is attached, as we've

3    heard today, it can be incorporated.  But I would first

4    point out that there is a conflict between the face of

5    the warrant and the list -- the -- the affidavit list

6    that's attached.

7              And, Your Honor, under either scenario, I

8    would submit to this Court that the warrant in this

9    case was exceedingly overbroad and went far beyond a

10   narrow probable cause that it was based on.  And I

11   can -- I can go into detail on that, but I think it --

12   it would be helpful to have a target to shoot at in

13   terms of whether it's the face of the warrant or the

14   affidavit in this case.  In either case, it's

15   overbroad, and I can discuss why.

16             THE COURT:  I think under the case law you

17   mentioned that the Court is going to judge the

18   particularity of the sufficiency of the search warrant

19   based on both the face of the search warrant and the

20   affidavit.

21             MR. GOROKHOV:  Right.  Together, Your Honor?

22             THE COURT:  Together, yes.

23             MR. GOROKHOV:  Your Honor, at this point,

24   then I'll go to the -- to the overbreadth and probable

25   cause points.  So I'll just start by giving this Court

1  a few examples.

2          First of all, in terms of the documents to be

3  seized in this case, as Detective Leightley testified

4  and as the warrant reflects, there really wasn't any

5  limitation on the documents to be seized.  We know that

6  both from the way that the warrant was written and from

7  the execution of the warrant.  Detective Leightley used

8  his judgment.  He used his discretion to take or not

9  take what he thought would help support the case.

10          And even in a case -- a wide-ranging, complex

11 fraud case -- most recently the *Manafort* case decided

12 by Judge Ellis -- we know that there is some kind of a

13 qualification placed on the types of documents to be

14 seized.  In that case, it was financial documents,

15 which is a very broad category, but at least they're

16 somehow confined.  In this case, the documents were not

17 meaningfully confined, and the officer just kind of

18 took what he thought would help the case.

19          Secondly, Your Honor, there's the issue of

20 ownership.  Who owns the limitation on the ownership?

21 Again, the fact that Officer Leightley went to search

22 only in Christopher Sueiro's room or that he got the

23 help of the roommate to only identify items in

24 Christopher Sueiro's room is not the issue.

25          The issue is what does the face of the

1  warrant say, and the face of the warrant plainly

2  authorized the seizure of all items -- all of these

3  broad categories of items in the house.

4          So, for example, they could have taken his

5  roommate's passport if they wanted.  They could have

6  taken any roommate's cell phone if they wanted.  That's

7  the face of the warrant.  That's what this Court has to

8  look at in determining --

9          THE COURT:  Well, it does designate the

10 underlying offense that the categories pertain to.

11         MR. GOROKHOV:  That's correct, Your Honor.

12         But, for example, in the *Griffith* case, the

13 D.C. Circuit case, they clearly identified that they

14 were looking at one specific person, Griffith, for

15 example, for the crime of murder, but then the search

16 warrant authorized them to take any cell phones in the

17 house belonging to anybody.  And the D.C. Circuit

18 specifically said that that's not good enough.  And

19 they suppressed the whole warrant.  The police in that

20 case didn't even take any cell phones.  They just took

21 a firearm.  But they suppressed all of the evidence in

22 that case.

23         By contrast, in the *Manafort* case, for

24 example, Your Honor, the defense complained in that

25 case:  Why did the police take items belonging or

1  pertinent to the wife?  Why did they take, for example,

2  documents pertinent to the wife?  And Judge Ellis

3  reasoned that's because the affidavit plainly said why

4  the wife was involved in the accounts or involved in

5  some of the businesses that were at issue in the

6  searches.

7          We don't have anything like that in this

8  case.  We have no connection, no nexus to the

9  roommates.  And the plain language of the warrant

10 doesn't limit it to Mr. Sueiro's property -- or the

11 plain language of Attachment C, which is the only part

12 that's incorporated into the -- which is the only part

13 that controls what is actually being seized.

14         A further problem, Your Honor -- and I would

15 submit perhaps the biggest problem in this case -- is

16 the fact that the warrant authorized seizure of items

17 that Detective Leightley didn't even have probable

18 cause that Mr. Sueiro owned.

19         So the most prominent example would be the

20 telephone.  I asked Detective Leightley if there was

21 any evidence that Mr. Sueiro actually owned a phone.

22 And, in fact, Detective Leightley candidly and very

23 openly answered that the evidence he had actually

24 suggested that Mr. Sueiro did not own a phone.  And, in

25 fact, he didn't.

1          So, again, Your Honor, by analogy to the

2    *Griffith* case, the D.C. Circuit case, one of the things

3    that they pointed to in that case was this:  You can't

4    just go in saying a person may own a phone.  And if he

5    owns a phone, then it's possible that that phone will

6    contain evidence of a crime.  You can't go in saying a

7    person may own an external hard drive.  And if he does,

8    well, maybe that hard drive has evidence of a crime.

9    That is not -- that does not come close to the kind of

10   showing that needs to be made to establish probable

11   cause to seize these items.  So that's yet another

12   issue in this case.

13          Your Honor, the final example I'll give is it

14   has to do with the firearms.  The offenses in this case

15   that were listed were e-mail threats.  These were very

16   specific threats that were made in the body of an

17   e-mail.  They did not list, for example, a suspicion

18   that Mr. Sueiro was planning to commit murder, that

19   Mr. Sueiro was stalking somebody, that Mr. Sueiro was

20   doing any of those things.  The only crime listed was

21   the threats, which was completed by the time these

22   warrants -- this warrant was sworn out.

23          And the fact that the government or the

24   police say that, well, we needed to find out whether he

25   had the means to carry out the threat, Your Honor, I

1  think is a -- it's an empty argument for a number of

2  reasons.

3           First of all, there's a problem with that

4  argument in that -- you know, the example I would give

5  the Court is that if the government had suspected

6  someone of a structuring offense -- you know,

7  depositing money, less than $10,000, right -- and then

8  they got a warrant to seize the person's car because he

9  would need the car to drive to the bank to deposit the

10  money, I mean, that's just far removed from the actual

11  offense that's at issue in the case.

12           Secondly, Your Honor, if they really

13  sincerely believed that Mr. Sueiro intended to -- even

14  if they didn't put it in the warrant but they believed

15  that Mr. Sueiro intended to do something bad to

16  Ms. Olsen, why did they wait three days from the time

17  of obtaining the arrest warrant to the time that

18  Mr. Sueiro was actually arrested on the 5th?  I think

19  that just shows, Your Honor, that they didn't put it in

20  this document because they didn't believe that

21  Mr. Sueiro was actually planning to harm Ms. Olsen.

22           But in any event, the face of the warrant has

23  to control, and they didn't put anything beyond threats

24  into the face of the warrant.

25           Your Honor, there's a bunch of other things.

1    Again, I think my argument already covers this about,

2    you know, things like printers, plotters, all those

3    things that the government had no evidence that

4    Mr. Sueiro actually possessed.  And it was just maybe

5    he possesses it and maybe there's evidence of a crime

6    if we look around.

7            If Your Honor has no questions on those

8    points, I can proceed to the good faith --

9            THE COURT:  Please.

10           MR. GOROKHOV:  So just a couple of points

11   about good faith, and I'm going to focus on the

12   government's response that they made to the filing by

13   prior counsel.  I want to just point out a couple of

14   legal issues with good faith and then proceed to the

15   facts.

16           So number one, good faith is a little bit

17   misleading because it actually has to do with objective

18   reasonableness, not subjective good faith.

19           Secondly, the courts have been clear that in

20   considering good faith, we don't just evaluate some

21   random police officer.  We evaluate the particular

22   police officer who applied for the affidavit and the

23   knowledge that that particular police officer had in

24   this case, which is very important in this case, Your

25   Honor.

1          Thirdly, it's the government that actually
2 has the burden to establish good faith.  It's the
3 government that has the burden to establish that
4 Detective Leightley was reasonable in obtaining the
5 warrant that he got in this case.
6          So without assuming the burden, without
7 assuming the burden, I would just -- I would just point
8 Your Honor back to all of my arguments dealing with
9 probable cause and dealing with overbreadth and point
10 out that it's not reasonable for Detective Leightley to
11 get a warrant for every device in the house when he
12 knows it's Christopher Sueiro they're looking at or
13 Christopher Sueiro's room or Christopher Sueiro's
14 property.  It's not reasonable for Detective Leightley
15 to say maybe he has a phone and maybe that phone has
16 evidence of a crime.  All of these things are not
17 objectively reasonable given the investigation that
18 Detective Leightley did and the knowledge that
19 Detective Leightley had at the time.
20          He may sincerely believe these things, and I
21 don't doubt it, Your Honor.  I'm not alleging any kind
22 of bad faith, any kind of a motive.  He may have
23 sincerely believed all of these things, Your Honor.
24 But in a search warrant, you have to come forward with
25 articulable evidence why certain evidence exists and

1  why it's likely to contain evidence of the crime.  And

2  under the broad search warrant we have here, I think,

3  Your Honor, the government falls far short of the good

4  faith standard.

5          THE COURT:  All right.  Thank you.

6          MR. GOROKHOV:  Thank you, Your Honor.

7          THE COURT:  Counsel.

8          MR. BURKE:  Your Honor, I won't repeat what's

9  in our brief.

10          On particularity, it only requires that the

11  warrant state the place to be searched, which is a

12  house, the things to be seized, which include

13  computers, and the type of evidence you're looking for,

14  evidence of a threats violation.

15          The *Williams* case that we cited in the Fourth

16  Circuit is extremely similar where you had someone who

17  made a threat against children.  The warrant allowed

18  any and all computers indicative of violations of the

19  threats statute, and that was sufficiently particular.

20          There's another case we didn't cite, but it's

21  *Dickerson* in the Fourth Circuit, 166 F.3d 667, pincite

22  694.  It said that the search for evidence relating to,

23  quote, a specific unlawful activity, such as narcotics

24  or theft of a fur coat, is sufficiently particular.  So

25  we think we certainly had that here.

1           As Your Honor pointed out, there was a limit.
2    It wasn't just any computer.  It was limited to the
3    crime under investigation, which was threats, and the
4    title of the warrant was In Re Christopher Sueiro.  So
5    it was focused on him.  That's certainly how the
6    detective interpreted it.  As Your Honor asked him, did
7    he go to other rooms?  No, he did not.
8           Just on a couple of matters that were brought
9    up.  In terms of the documents, it wasn't just any
10   documents.  Again, documents related to the crime that
11   were evidence.  He testified that he was looking for
12   *indicia* of occupancy, like his bills or things related
13   to his work.  That is very common in a search warrant
14   to look for.
15          Then, just briefly, on other matters that he
16   brought up, the phone, the firearms.  First, the phone
17   is a computer.  There was evidence that he was using a
18   computer to send these threats.  So if there was a
19   phone, it certainly would have been within the scope of
20   the investigation.  But in any event, there's no phone
21   here to be suppressed.
22          We're not seeking to use the firearm.  So
23   even if that was somehow outside the scope of the
24   warrant, it would be severable from the rest of the
25   warrant, and it wouldn't affect what was seized and

1  what was clearly within probable cause, which was the

2  computers.  That's what we intend to use at trial.

3            THE COURT:  Is that how it works?

4            MR. BURKE:  Yes, Your Honor.

5            THE COURT:  You can basically sever the

6  overbreadth of the warrant, exclude evidence within the

7  overbreadth, and the rest of the seizures are otherwise

8  valid?

9            MR. BURKE:  Yes, Your Honor.  It was actually

10  discussed in the case cited by the defense, which was

11  the Second Circuit case, *U.S. v. Galpin*, where they go

12  into the severability analysis at the end.  I can cite

13  Your Honor to a Fourth Circuit on this if necessary.

14            THE COURT:  All right.

15            MR. BURKE:  That just goes down to generally

16  the exclusionary rule that we're careful not to use it

17  unless absolutely necessary.

18            THE COURT:  All right.

19            MR. BURKE:  Finally, Your Honor, the good

20  faith.  I mean, to the extent that this is a close

21  call, you heard the testimony from the detective.  He

22  was scrupulously attempting to follow the law.  He went

23  back to get a warrant three or four different times.

24  When he found evidence of child pornography, he stopped

25  immediately and went to get another warrant, again,

1    showing that he took the part of the warrant that says

2    that this is in relation to threats crimes very

3    seriously.

4              THE COURT:  There were a total five warrants?

5              MR. BURKE:  Five total, Your Honor.  And even

6    to the point that, apparently, the magistrates there

7    told him, you know, stop coming back to us this often

8    for these sorts of things.  So he's clearly going as

9    much as he can.

10             So to the extent that there's any question,

11   we would rely on that.

12             The last thing I would point out -- actually,

13   a case that was brought to my attention by defense

14   counsel -- that in the *Paul Manafort* case, Judge Ellis

15   wrote a long opinion on this, and he found -- it was a

16   similar claim saying that they were asking for all

17   computers in the house and all documents.  And the

18   first Judge Ellis found to be sufficiently particular.

19   But then he said, even if it wasn't, it would be

20   covered by good faith.  And this is what he says at the

21   end.  He says, Courts have routinely rejected

22   particularity challenges to warrants using the same

23   broad categories contained in this warrant, i.e., any

24   and all financial records, evidence of state of mind,

25   and electronic devices and storage media.  Given that

1    courts have approved warrants containing the same

2    language as the warrant at issue here, it is

3    inconceivable that a reasonably well-trained officer

4    would have known that the warrant was invalid despite

5    the magistrate judge's authorization.

6         There he's talking about a team of FBI agents

7    led by a team of federal prosecutors at the special

8    counsel's office.  Here Detective Leightley is acting

9    on his own and is clearly doing so in good faith and

10   relying on his magistrates.

11        Thank you.

12        THE COURT:  All right.  Mr. Gorokhov.

13        MR. GOROKHOV:  Your Honor, thank you.  I'll

14   be as brief as possible here.

15        I'll start with some of the points the

16   government raised as to good faith.  Again, I think a

17   large part -- and I don't doubt Detective Leightley's

18   subjective intent to do things right.  That's not the

19   issue here at all.  The fact that he got subsequent

20   four warrants is not the issue here at all, Your Honor.

21   The issue here is what was his objective reasonableness

22   in seeking all of these items in the initial warrant

23   where they seized these items.  So a lot of what the

24   government says, Your Honor, is simply not relevant.

25        In terms of the *Manafort* case -- and I

1  neglected to provide the citation.  I can for Your

2  Honor if that needs to be.

3              THE COURT:  No.  That's all right.

4              MR. GOROKHOV:  In terms of the *Manafort* case,

5  there's an interesting distinction because one of the

6  facts that Judge Ellis actually focused on was that the

7  FBI agent in that case talked to an employee who

8  currently worked for Manafort at that time, and that

9  employee provided the FBI with exactly the kind of

10  information that was missing in this case.  That

11  employee told the FBI that Manafort uses this computer

12  to do business.  He has a lot of business documents in

13  this part of his house.  He uses electronic devices in

14  connection with his business documents.  He's got a

15  drawer full of cell phones that he -- that he -- you

16  know, when he stops using the cell phone, he puts it in

17  this drawer.

18              So that's exactly the kind of evidence that

19  lays the foundation, that lays the appropriate basis

20  for a police officer to then go and obtain a search

21  warrant.  That's exactly the kind of information and

22  evidence that was missing in this case, Your Honor.

23              In terms of the *Williams* case that the

24  government cites, I would -- I would just briefly note

25  that in that case, there was a threat -- there was an

1    allegation of threats, but there was also an allegation

2    of harassment by computer in which the defendant in

3    that case clearly said things about child abuse and

4    said things about being a pedophile.  And that's

5    actually -- that aspect of the warrant was actually

6    what was relied on in upholding the search of the

7    electronic media in that case.

8            It wasn't the threats part.  It was the fact

9    that he sent lewd and lascivious materials involving

10   children and child abuse that gave them probable cause

11   to search these devices for inappropriate materials for

12   child porn -- child abuse materials.

13           The last point, Your Honor, I'll make is one

14   that you asked of the government, which is if the

15   warrant is facially overbroad, is it severable?  The

16   answer to that, Your Honor, I think is clear from

17   *Griffith* that -- from the D.C. Circuit case and other

18   cases that if the warrant is facially overbroad,

19   everything is suppressed.  That's the appropriate

20   remedy.

21           We would submit, Your Honor, that *Griffith* is

22   the controlling case on that even though it's from a

23   different circuit, but I think it's fairly clear and

24   supported by Supreme Court precedent.

25           THE COURT:  All right.

1            MR. GOROKHOV:  Thank you, Your Honor.

2            THE COURT:  I've reviewed the motion.  I

3  think it's a substantial motion and it raises

4  substantial issues that the Court needs to deal with.

5            First of all, I think the clearest issue is

6  the probable cause issue.  I think there was clearly

7  probable cause for each of these warrants.

8            I think that the more difficult -- the closer

9  issue is with respect to the particularity requirement

10  of these warrants.  The particularity requirement

11  really has three components:

12            First, the warrant must identify the specific

13  offense for which the police have established probable

14  cause, which these warrants do;

15            Second, the warrant must describe the place

16  to be searched, which these warrants do; and

17            Third, the warrant must specify the items to

18  be seized by the relation to the designated crimes, and

19  it's this third area that raises, I think, substantial

20  issues.

21            Here the warrants do incorporate the

22  affidavits, and the Court has to assess the

23  particularity requirement within the context of the

24  entire warrant, including the items and also the

25  language of the warrant, which does, albeit in less

1 than perhaps ideal language, reference that the items

2 to be seized are those that relate to the designated

3 offense.

4         Based on all the facts and circumstances of

5 these warrants, the Court does conclude -- although I

6 do think it is a substantial issue -- that the warrants

7 satisfy the particularity requirement.  Alternatively,

8 the Court also concludes that any overbreadth falls

9 within the good faith exception.  The Court concludes

10 that the affidavits are not so facially deficient by

11 failing to particularize the place to be searched or

12 the things to be seized that the executing officers in

13 this case could not reasonably presume it to be valid.

14         As I said, a lot of these are standard forms,

15 standard practices.  As Judge Ellis mentioned in his

16 *Manafort* opinion, courts have approved much of the

17 language that's challenged in this case under various

18 circumstances.  Overall, the Court concludes that any

19 defect in these warrants are covered by the good faith

20 exception.

21         So for those reasons, the Court is going to

22 deny the motion to suppress.

23         Anything further?

24         MR. BURKE:  Not from the government, Your

25 Honor.

1          THE COURT:  All right.  Your argument was

2  excellent, Mr. Gorokhov.

3          MR. GOROKHOV:  Oh, thank you, Your Honor.

4          THE COURT:  It's a tough issue.

5          All right.  Anything else?

6          MR. GOROKHOV:  No, Your Honor.  Thank you.

7          THE COURT:  All right.  The Court stands in

8  recess until 2:00.

9          ------------------------------------
                    Time:  12:34 p.m.
10

11

12

13

14

15

16

17

18

19

20

21
        I certify that the foregoing is a true and
22
    accurate transcription of my stenographic notes.
23

24
                              _____
                                      /s/
25                            Rhonda F. Montgomery, CCR, RPR


Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599